No. 22-1593

---

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

SYLVESTER WINCE,

                                             Plaintiff-Appellant,

      v.

CBRE et al.,

                                    Defendants-Appellees.

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
Case No. 19 cv 1546
The Honorable Steven C. Seeger, Judge Presiding
_____

## BRIEF OF DEFENDANTS-APPELLEES
_____

REED SMITH LLP
Jill S. Vorobiev
Attorney for the
Defendants-Appellees

10 South Wacker Drive, Suite 4000
Chicago, Illinois 60606
(312) 207-1000

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-1593

Short Caption: Sylvester Wince v. Joe Hernandez, et al

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 CBRE, Inc.; Richard Saulig; Sean Holland; Joe Hernandez; Ernie Pierz; Pedro Ravelo; Maya Nash

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 Reed Smith LLP; Morgan Lewis & Bockius, LLP

(3)     If the party, amicus or intervenor is a corporation:

   i)        Identify all its parent corporations, if any; and

            CB/TCC, LLC; CB/TCC Global Holdings Limited; CBRE Services, Inc; and CBRE Group, Inc.

   ii)       list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

            CBRE Group, Inc. is a publicly traded company that, indirectly through the above subsidiary entities, owns
            more than 10% of CBRE, Inc.

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
  N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
  N/A

Attorney's Signature: Jill S. Vorobiev                    Date: April 29, 2022

Attorney's Printed Name:  Jill S. Vorobiev

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes [✓]   No [ ]

Address:  10 South Wacker Drive, 40th Floor

            Chicago, Illinois 60606

Phone Number: 312-207-1000                    Fax Number:  312-207-6400

E-Mail Address: jvorobiev@reedsmith.com

rev. 12/19 AK

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................... 1

JURISDICTION .................................................................................... 3

ISSUES PRESENTED .......................................................................... 4

STATEMENT OF THE CASE ................................................................ 5

A.    Factual Background ................................................................... 5

    1.    Wince's Role at CBRE .................................................. 5

    2.    Wince's Claims of Unfair Treatment .......................... 5

    3.    Wince's Internal Complaints ..................................... 11

B.    Procedural Background ............................................................ 11

    1.    Commencement of the Case ....................................... 11

    2.    Partial Motion to Dismiss .......................................... 12

    3.    Summary Judgment .................................................... 12

SUMMARY OF ARGUMENT ............................................................... 15

ARGUMENT ....................................................................................... 16

I.    STANDARD OF REVIEW ........................................................... 16

II.   THE DISTRICT COURT PROPERLY ANALYZED WINCE'S RACE
      DISCRIMINATION CLAIM AND GRANTED SUMMARY
      JUDGMENT .............................................................................. 18

    A.    Applicable Legal Standard .................................................. 18

    B.    Wince Cannot Meet the *McDonnell Douglas* Test On Any of His
       Claims ................................................................................. 19

    C.    Wince's Evidence As A Whole Is Insufficient ....................... 27

    D.    Wince's Cases Are Inapposite ............................................. 29

i

**TABLE OF CONTENTS**
**(Cont.)**

                                                                    **Page**

III.   THE DISTRICT COURT PROPERLY GRANTED DEFENDANTS'
     MOTION FOR SUMMARY JUDGMENT ON WINCE'S
     CONSTRUCTIVE DISCHARGE CLAIM..............................................31

IV.   THE DISTRICT COURT PROPERLY GRANTED CBRE'S MOTION
     FOR SUMMARY JUDGMENT ON WINCE'S RETALIATION CLAIM ........34

V.   THE DISTRICT COURT PROPERLY GRANTED DEFENDANTS'
     MOTION TO DISMISS WINCE'S BREACH OF CBA CLAIM......................35

     A.   Section 301 of the LMRA preempts Wince's Breach of Contract
        Claim......................................................................................35

     B.   Wince failed to allege sufficient facts to support his claim that
        the Union violated its duty of fair representation ...............................38

CONCLUSION..........................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atchley v. Heritage Cable Vision Assocs.*,
    101 F.3d 495 (7th Cir. 1996) ........................................................................ 36, 37

*Black v. Wrigley*,
    997 F.3d 702 (7th Cir. 2021) ........................................................................ 32, 34

*Blasdel. v. Northwestern Univ.*,
    687 F.3d 813 (7th Cir. 2012) .............................................................................. 22

*Boss v. Castro*,
    816 F.3d 910 (7th Cir. 2016) .............................................................................. 17

*Boston v. U.S. Steel Corp.*,
    816 F.3d 455 (7th Cir. 2016) .............................................................................. 26

*Brown v. Advocate S. Suburban Hospital & Advocate Health &*
    *Hospitals Corp.*,
    700 F.3d 1101 (7th Cir. 2012) ............................................................................ 22

*Brownlee v. Kyocera Sgs Precision Tools, Inc.*,
    Cause No. 1:20-CV-00450-HAB, 2022 U.S. Dist. LEXIS 56615 (N.D.
    Ind. Mar. 29, 2022) ............................................................................. 28, 30, 31

*Caterpillar Inc. v. Williams*,
    482 U.S. 386 (1987) ...................................................................................... 35, 36

*Chatman v. Bd. of Educ. Of Chi.*,
    5 F.4th 738 (7th Cir. 2021) ........................................................................... 26, 28

*Cole v. Bd. of Trs.*,
    838 F.3d 888 (7th Cir. 2016) .............................................................................. 23

*Coleman v. Donahoe*,
    667 F.3d 835 (7th Cir. 2012) .............................................................................. 30

*Courtney v. Biosound, Inc.*,
    42 F.3d 414 (7th Cir. 1994) ................................................................................ 17

*Cunningham v. United Airlines, Inc.*,
    No. 13 C 5522, 2014 U.S. Dist. LEXIS 13414 (N.D. Ill. Feb. 4, 2014) ................. 40

## TABLE OF AUTHORITIES
### (Cont.)

*EEOC v. PVNF, L.L.C.*,
    487 F.3d 790 (10th Cir. 2007) ................................................................ 34

*Electrical Workers v. Hechler*,
    481 U.S. 851 (1987) ............................................................................... 36

*Fields v. Bd. of Educ.*,
    928 F.3d 622 (7th Cir. 2019) ................................................................ 32

*Gillems v. Hapag-Lloyd Am., Inc.*,
    523 Fed. Appx. 415 (7th Cir. 2013) ....................................................... 26

*Herron v. DaimlerChrysler Corp.*,
    388 F.3d 293 (7th Cir. 2004) .......................................................... 15, 32

*Hitchcock v. Angel. Corps., Inc.*,
    718 F.3d 733 (7th Cir. 2013) ................................................................ 30

*Hobbs v. City of Chicago*,
    573 F.3d 454 (7th Cir. 2009) ................................................................ 23

*Holland v. Jefferson Nat'l Life Ins. Co.*,
    883 F.2d 1307 (7th Cir. 1989) .............................................................. 17

*Hooper v. Proctor Health Care Inc.*,
    804 F.3d 846 (7th Cir. 2015) ................................................................ 22

*Hunt v. Wal-Mart Stores, Inc.*,
    931 F.3d 624 (7th Cir. 2019) ................................................................ 21

*Int'l Travelers Cheque Co. v. BankAmerica Corp.*,
    660 F.2d 215 (7th Cir. 1981) ................................................................ 32

*Johnson v. Advocate Health & Hospitals Corp.*,
    892 F.3d 887 (7th Cir. 2018) .................................................... 15, 32, 33

*Jordan v. Summers*,
    205 F.3d 337 (7th Cir. 2000) ................................................................ 24

*Keeton v. Morningstar, Inc.*,
    667 F.3d 877 (7th Cir. 2012) ................................................................ 19

*Land of Lincoln Goodwill Indus., v. PNC Fin. Servs. Grp.*,
    762 F.3d 673 (7th Cir. 2014) ................................................................ 38

*Lax v. Mayorkas*,
    20 F.4th 1178 (7th Cir. 2021) ............................................................... 16

**TABLE OF AUTHORITIES**
**(Cont.)**

*Lingle v. Norge Division of Magic Chef,*
    486 U.S. 399 (1988) ................................................................ 37, 38

*Majors v. GE,*
    714 F.3d 527 (7th Cir. 2013) ................................................. 17

*Malin v. Hospira, Inc.,*
    762 F.3d 552 (7th Cir. 2014) ................................................. 35

*McDonnell Douglas Corp. v. Green,*
    411 U.S. 792 (1973) .......................................................... 12, 18, 19

*Nelson v. Stewart,*
    422 F.3d 463 (7th Cir. 2005) ................................................. 35

*Nikoloff v. Ziliak,*
    827 Fed. Appx. 600 (7th Cir. 2020) ...................................... 27

*Oliver v. Joint Logistics Managers, Inc.,*
    893 F.3d 408 (7th Cir. 2018) ................................................. 19

*Olson v. Bemis Co.,*
    800 F.3d 296 (7th Cir. 2015) ................................................. 38

*Ortiz v. Werner Enterprises, Inc.,*
    834 F.3d 760 (7th Cir. 2016) ......................................... 12, 18, 20

*Packer v. Trs. of Indiana Univ. Sch. of Med.,*
    800 F.3d 843 (7th Cir. 2015) ................................................. 17

*Pantoja v. Texas Gas & Transmission Corp.,*
    890 F.2d 955 (7th Cir. 1989) ................................................. 37

*Paschall v. Tube Processing Corp.,*
    28 F.4th 805 (7th Cir. 2022) ................................................. 22

*Passananti v. Cook Cnty.,*
    689 F.3d 655 (7th Cir. 2012) ................................................. 33

*Pelech v. Klaff-Joss, LP,*
    828 F. Supp. 525 (N.D. Ill. 1993) ......................................... 37

*Porter v. Erie Foods Intern., Inc.,*
    576 F.3d 629 (7th Cir. 2009) ................................................. 21

*Riley v. Elkhart Cmty. Sch.,*
    829 F.3d 886 (7th Cir. 2016) ................................................. 18

**TABLE OF AUTHORITIES**
**(Cont.)**

*Robertson v. Wisconsin Dep't of Health Servs.*,
    949 F.3d 371 (7th Cir. 2020) ................................................................. 24

*Rogers v. Jewel Food Stores, Inc.*,
    No. 13 C 6761, 2014 U.S. Dist. LEXIS 138709 (N.D. Ill. Sept. 30,
    2014) ....................................................................................................... 40

*Russell v. Acme-Evans Co.*,
    51 F.3d 64 (7th Cir. 1995) .................................................................... 26

*Seddon v. Maytag Corp.*,
    178 Fed. Appx. 557 (7th Cir. 2006) ...................................................... 31

*Shipley v. Chicago Bd. of Election Comm'rs*,
    947 F.3d 1056 (7th Cir. 2020) ................................................... 20, 27, 35

*Simpson v. Beaver Dam Cmty. Hospitals, Inc.*,
    780 F.3d 784 (7th Cir. 2015) ................................................................ 17

*Smith v. Rock-Tenn Servs.*,
    813 F.3d 298 (6th Cir. 2016) ................................................................ 33

*Souter v. Int'l Union, United Auto., etc., Local 72*,
    993 F.2d 595 (7th Cir. 1993) ................................................................ 40

*Taha v. Int'l Bhd. of Teamsters, Local 781*,
    947 F.3d 464 (7th Cir. 2020) ................................................................ 40

*Tifft v. Commonwealth Edison Co.*,
    366 F.3d 513 (7th Cir. 2004) ................................................................ 36

*Vaca v. Sipes*,
    386 U.S. 171 (1967) .............................................................................. 38

*Washburn v. IBP, Inc.*,
    910 F.2d 372 (7th Cir. 1990) ................................................................ 32

*White v. City of Chicago*,
    829 F.3d 837 (7th Cir. 2016) ................................................................ 17

*Yeftich v. Navistar, Inc.*,
    722 F.3d 911 (7th Cir. 2013) ..................................................... 38, 39, 40

**Statutes**

28 U.S.C. § 1291 ...................................................................................... 4

# TABLE OF AUTHORITIES
## (Cont.)

28 U.S.C. § 1331 ........................................................................... 3

28 U.S.C. § 1343 ........................................................................... 3

28 U.S.C. § 1367 ........................................................................... 4

29 U.S.C. § 185(a) ................................................................. *passim*

42 U.S.C. § 1981 .................................................................... 3, 14

42 U.S.C. § 2000e .................................................................. 3, 14

42 U.S.C. § 2000e-5(f) ................................................................ 3

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................ 16

## INTRODUCTION

This case involves claims brought by a former stationary engineer at CBRE who voluntarily left his employment and sued for race discrimination, retaliation, and breach of the collective bargaining agreements that governed his employment.

The district court correctly found that plaintiff-appellant Sylvester Wince ("Wince") failed to adduce sufficient evidence to support his claims of race discrimination. Wince lost out on promotions to better-qualified candidates and the only discipline he suffered—a verbal reprimand—was not an adverse action. In any event, the reprimand was issued for Wince's admitted failure to respond to a work order that was within his job duties as a stationary engineer. While Wince complains of being denied overtime, he has no evidence that non-Black similarly situated employees were given more overtime opportunities nor can he refute the legitimate, nondiscriminatory reasons he was denied. Finally, while Wince found racist comments on his lunchbox and was called a nickname he did not like ("Sly"), he never reported the comments to CBRE or shared his belief the nickname was racist. On appeal, Wince argues the district court incorrectly weighed "competing inferences" that could be drawn from these issues, but that is not the case. There simply were no competing inferences to be drawn. As the district court found, while Wince affiliates his work-related issues with discrimination, the evidence of discrimination is simply not there.

With respect to Wince's claim of constructive discharge, this claim is not an independent cause of action and therefore the district court properly granted summary judgment in CBRE's favor on that claim. Moreover, none of the incidents

Wince describes constitute a hostile work environment, let alone meet the higher standard required to establish a claim of constructive discharge. Also, while Wince offered testimony he once was told there were project management positions elsewhere, this was in the context of a discussion about promotion and was not at all suggestive of imminent termination; in fact, he remained employed for over a year following that discussion and was approved for tuition reimbursement to improve his credentials for promotion.

Wince hardly pursued his retaliation claim before the district court and seems to have abandoned it on appeal. Nevertheless, his complaints about racism in promotions were made years before he left the company and he has no evidence tying complaints he made of alleged race discrimination to any adverse actions he allegedly suffered.

Finally, the district court properly granted defendants' motion to dismiss Wince's breach of collective bargaining agreement claim on grounds the claim was preempted by Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C.§ 185(a), and that Wince failed to sufficiently allege that the union breached its duty of fair representation. As the district court found, Wince's claim that the collective bargaining agreements' provisions regarding transfers, promotions, overtime and time off were breached "hinges on the meaning of the CBA" and therefore "epitomizes the type of claim that the LMRA preempts." And, Wince has not alleged facts supporting the bare conclusion that the union breached its duty of fair representation.

In sum, the district court properly granted defendants' motion for summary judgment because Wince failed to adduce sufficient evidence to support his discrimination and retaliation claims. It also correctly dismissed Wince's breach of collective bargaining agreement claim on grounds it was preempted and Wince came forward with only bare allegations to support his argument that the union breached its duty of fair representation. This Court should affirm both rulings.

## JURISDICTION

Wince's jurisdictional statement is not complete and correct, although defendants do not contest Wince's statement that both the district court and this Court have proper jurisdiction.

After filing a complaint on March 4, 2019 and several amended complaints, Wince filed a four-count third amended complaint against CBRE, Inc., Richard Saulig, Sean Holland, Jo[s]e Hernandez, Ernie Pierz, Pedro Ravelo, and Maya Nash ("defendants") on November 28, 2020. R. 1, 20, 52, 96.[1] CBRE is incorporated in the state of Delaware and has its principal place of business in the state of Texas.

The complaints alleged various employment discrimination claims pursuant to Title VII, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. R. 1, 20, 52, 96. The district court had jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1343, and also pursuant to 42 U.S.C. § 2000e-5(f) with respect to the Title VII claims. The initial, first and second amended complaints also included a claim of

---

[1] Defendants cite to district court record documents as "R __." Defendants cite to Wince's brief as "Br. at _." Wince filed a Short Appendix and Separate Appendix, but Wince failed to provide page numbers for these appendices.

violation of the collective bargaining agreement and the second and third amended complaints included a constructive discharge claim. R. 1, 20, 52, 96. The district court had supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367.

On October 26, 2020, the district court dismissed the second amended complaint's breach of collective bargaining agreement claim. R. 84. On March 10, 2022, the district court granted summary judgment to defendants on all of Wince's claims in the third amended complaint and entered judgment in their favor. R. 143-44. On April 8, 2022, Wince filed a notice of appeal. R. 145. This Court has jurisdiction over the appeal from a final judgment pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.    Whether the district court correctly entered summary judgment in defendants' favor on Wince's race discrimination claims where there were no competing inferences to be drawn and Wince failed to adduce sufficient evidence that race caused any adverse employment actions.

2.    Whether the district court correctly entered summary judgment in defendants' favor on Wince's constructive discharge claim where it is not an independent cause of action and Wince failed to adduce evidence of an abusive work environment so intolerable that his resignation was an appropriate response.

3.    Whether the district court correctly dismissed Wince's breach of collective bargaining agreement claim as preempted by Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), where this claim is directly founded on the collective bargaining agreement and Wince did not sufficiently plead a breach of the duty of fair representation by the union.

4

## STATEMENT OF THE CASE

### A.    Factual Background

#### 1.    Wince's Role at CBRE

Wince is African American.[2] R. 96 at ¶ 1. CBRE hired Wince as a stationary engineer in 2010 when the facilities department at Northwestern Memorial Hospital ("NMH") was contracted out to CBRE. R. 141 at ¶ 7. Stationary engineers perform tasks including preventative maintenance and repairs on equipment throughout the hospital campus. *Id*. at ¶ 8; R. 143 at 2. Wince holds a bachelor's degree in organizational behavior from Northwestern University, is certified in Basic Electricity 1, Refrigeration 1 and 2 and Indoor Air Quality 1 and 2, and is a licensed stationary engineer. R. 141 at ¶ 10. Wince's employment was governed by collective bargaining agreements between CBRE and the International Union of Operating Engineers of Chicago, Illinois and Vicinity Local 399 ("CBAs"). *Id*. at ¶¶ 21-31. Wince left his job at CBRE in October 2019. *Id*. at ¶ 80.

#### 2.    Wince's Claims of Unfair Treatment

Wince believed he was treated unfairly due to his race in the following ways:

*Promotion*. While a stationary engineer, Wince applied for two chief engineer and two assistant chief engineer positions in 2015-2016. R. 141 at ¶¶ 34, 36, 38, 41; R. 143 at 5. The chief engineer role is a bargaining unit position that is responsible

---

[2] Defendants cite to Defendants' Response to Plaintiff's Statement of Additional Uncontested Material Facts (R. 137) and Plaintiff's Response to Defendants' Statement of Material Facts (R. 141) for all undisputed facts. Defendants cite to depositions in minuscript form as R. __ at __ (minuscript page).

for the "safe, economical operation of the Building(s) and for all persons employed under the direction of the Chief Engineer." R. 141 at ¶ 32; R. 143 at 4. The assistant chief engineer role is a bargaining unit position one level below the chief engineer. R. 141 at ¶ 32. A lead engineer is one position below the assistant chief engineer, and below that is a stationary engineer. *Id.* at ¶ 33. Generally, the progression for internal promotion of stationary engineer is first to lead engineer, then to assistant chief engineer, and then to chief engineer. R. 141 at ¶ 33; R. 143 at 26.

Facilities Director Sean Holland selected Jose Hernandez (Hispanic) and Martin Walsh (White) to fill the Chief Engineer roles because they had the best qualifications, skills and ability to perform the job among the candidates. R. 141 at ¶¶ 35, 37. Wince did not know either candidate's credentials or background (*id.* at ¶¶ 34, 36), which were as follows:

- Jose Hernandez was an assistant chief engineer in the Controls area (two levels above Wince), had performed well in his roles at CBRE, demonstrated leadership skills, and held several stationary engineer licenses, including with the City of Chicago, Elgin and National Institute of Power Engineers 4 class, a Metasys certification from Johnson Controls on PMI and extended architecture, and was a licensed diesel mechanic. R. 141 at ¶ 35.

- Martin Walsh had over 20 years in engineer, lead engineer, assistant chief engineer and chief engineer roles—including having held chief engineer roles at two different real estate firms before joining CBRE. R. 141 at ¶ 37; R. 143 at 8.

The assistant chief engineer roles were awarded to Andrew Brudniak (White). R. 141 at ¶¶ 38, 41. Wince admitted he did not know who selected Brudniak or why. *Id*. at ¶ 38. Holland, along with a panel of other employees, determined Brudniak had the best qualifications, skills and ability among the candidates because he (1) already was serving in an assistant chief engineer role each time and in relation to the second opening, was rebidding for the exact role he previously held and (2) had numerous licenses/certifications, including in Air Conditioning, Refrigeration & Heating, Boiler Operations I, Universal Refrigerant Transition and Recovery Certification, Refrigeration Light Commercial Certification and a Stationary Engineer's license. *Id*. at ¶ 39.

Wince, in contrast to Hernandez, Walsh and Brudniak, did not have prior lead, assistant chief engineer or chief engineer experience and did not have more than the basic qualifications and certifications to perform the work that any general stationary engineer could be assigned. R. 121-6 at 37 of 96 (¶ 13); R. 143 at 27.

*Overtime*. Wince believes he was unfairly denied overtime in Controls on 18 days in 2018. R. 141 at ¶ 62. The overtime was awarded to individuals who officially worked for the Controls group, unlike Wince who only worked with Controls on occasion at the time. *Id*. at ¶¶ 9, 62. On 5 of the 13 days overtime was awarded (it was not awarded on 5 days), overtime was awarded to a Black employee. *Id*. at ¶ 62. Wince filed a grievance, which was denied. *Id*. at ¶ 63. Wince does not recall why it was denied or whether he pursued it further. *Id*. CBRE's overtime records showed Wince was offered 830.5 hours of overtime in 2018 and accepted only 56 hours. R. 141 at ¶ 44.

7

*Holidays.* Wince alleges he was denied holidays off due to his race. R. 96 at ¶¶ 48, 50. In 2016, Wince asked for and received New Year's Day off. R. 141 at ¶ 46; R. 143 at 10. In 2017, Wince asked for holidays and alternate days off, and was awarded the alternate dates. R. 141 at ¶¶ 47, 48. He filed a grievance, which was denied. *Id.* at ¶¶ 49, 50. Wince does not know if anyone filled out the forms the way he did—asking for both holidays and alternate days off—or how CBRE handled similar requests. *Id.* at ¶¶ 47, 50. During the grievance process, Wince did not allege that the holiday award was based on his race. *Id.* at ¶ 50. Although his further attempt at pursuing his grievance was untimely, CBRE gave him a holiday off, as well as allowed him to keep the alternate day off he originally requested in resolution of his grievance. *Id.* at ¶¶ 51, 54.

Wince was denied holidays off in 2018 due to insufficient coverage and given 1 holiday off in 2019. R. 141 at ¶¶ 57, 59. Black stationary engineers with more seniority than Wince received holidays instead of him in 2017-2019. *Id.* at ¶¶ 56, 58, 60.

*Bonuses.* Wince alleges his annual bonus was unfairly reduced. R. 96 at ¶¶ 27-28. But in 2018, CBRE gave all employees in Wince's work group (Group 1) an annual bonus of $879.38. R. 141 at ¶ 64. All members of Work Groups 2 and 3 received bonuses of $1,096.3 and $1,058.08, respectively. *Id.* In 2019, CBRE gave the members of every work group the same bonus. *Id.* at ¶ 65.

*Tuition Reimbursement.* Wince believes CBRE denied him sufficient tuition reimbursement. R. 96 at ¶ 26. Wince completed—and CBRE reimbursed him for— one class toward a project management certification from the University of Chicago

in June 2018. R. 141 at ¶¶ 43, 45. Facilities Director Pierz encouraged him to take the course and approved his request for unscheduled PTO to take it, stating: "I am a big supporter in folks seeking further training/education and would like to try to accommodate his request, . . . ." *Id*. Wince only took the one class and did not complete his project management certification. *Id*.

*Verbal Warning*. Wince received a verbal warning on March 5, 2019 from Hernandez for failing to respond to a work order regarding a leak in a kitchen. R. 141 at ¶ 13. Wince suffered no loss of pay in connection with the verbal warning. *Id*. Wince believes he received the verbal warning because he was a "minority" but offered no evidence to support this belief. *Id*. at ¶¶ 13, 14; R. 143 at 36.

*Assignments*. Wince alleges that in 2018 or 2019, Hernandez assigned Wince trainee-level duties. R. 141 at ¶ 74. The example he provided was that he was required to clean drains. R. 135 at ¶ 18. Wince's job description states that stationary engineers are responsible for "all aspects of plumbing" and they "[m]ay perform less technical duties as required, such as minor plumbing." R. 121-1 at 176-178 of 181 (job description); R. 137 at ¶ 18. Wince did not lose pay in connection with performing these plumbing duties and could not estimate how many times this happened, and confirmed it also happened to a White employee. R. 141 at ¶¶ 74, 75.

*Comments*. In 2016 or 2017, the "n-word", "you don't belong" and "we don't want you here" were written on Wince's lunchbox. R. 141 at ¶ 77. Wince does not know who wrote the comments and never told anyone at CBRE about them. *Id*.; R. 143 at 40.

Wince complains he was referred to by a nickname "Sly" that he did not like. R. 141 at ¶¶ 78, 79. Wince testified that "people just felt abbreviat[ing] my name [Sylvester] was easier to remember me by." R. 121-1 at 12(8-9). He believed the nickname was racially derogatory because "[w]hen you think of someone as Sly, you think of someone sneaky or like a – you know, like someone that's trying to do something on – you know, not honest." R. 121-1 at 13(8-15). Wince never told anyone he believed the nickname was racially derogatory. R. 121-1 at 15(22-24), 16(1). Rather, he told people he was uncomfortable being called a name that "wasn't [his] name" and that afterwards, they stopped. R. 121-1 at 13(1-7), 15(16-17); R. 141 at ¶¶ 78-79.

Saulig allegedly once in a meeting said to Wince: "we don't like you." R. 141 at ¶ 70. Wince does not know if Saulig said this to anyone else. *Id*. Nor does he connect this statement to his race or any adverse action taken against him. *Id.*; R. 143 at 27.

Pierz had a career development conversation with Wince, at which time Pierz told him CBRE did not have any leadership positions open and he probably would be better off looking outside of CBRE where they had immediate project manager positions open. R. 141 at ¶ 68. Wince interpreted this comment as discriminatory, although he does not know if Pierz made similar comments to others. *Id*. Afterwards, Pierz encouraged Wince to take a project management course and approved tuition reimbursement for it. R. 141 at ¶¶ 43, 45, 68; R. 143 at 39. Wince then remained employed with CBRE until he left in October 2019. R. 141 at ¶ 80.

### 3.    Wince's Internal Complaints

In 2013-14, an outside investigation was conducted following a complaint brought by one of Wince's co-workers, Charles Wilson. R. 121-1 at 36(3-16); R. 141 at ¶ 19. During the investigation, Wince stated he never was promoted when asked if he felt African Americans were treated differently. R. 121-1 at 39(1-10). In 2017, Wince called CBRE's ethics hotline and complained about his failure to be promoted based on his race. R. 141 at ¶ 18. Wince does not know if his complaint was investigated. *Id*.

## B.    Procedural Background

### 1.    Commencement of the Case

On November 5, 2018, Wince filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging race discrimination and retaliation. R. 141 at ¶ 4. On November 30, 2018, the EEOC issued a notice of right to sue. *Id*.

On March 4, 2019, Wince filed a four-count complaint against defendants alleging discrimination, retaliation and violation of the collective bargaining agreement. R. 1. Wince subsequently filed first and second amended complaints asserting discrimination, retaliation, violation of the collective bargaining agreement, several wage claims and—with respect to the second amended complaint—constructive discharge. R. 20, 52.

After the district court dismissed the claims against one of the individual defendants who was incorrectly named on November 16, 2020, it granted Wince leave to file a third amended complaint for the purpose of correctly naming that

defendant. R. 91, 93. On November 28, 2020, Wince filed a third amended complaint alleging race discrimination, retaliation and constructive discharge. R. 96.

### 2.     Partial Motion to Dismiss

On October 26, 2020, the district court granted defendants' motion to dismiss Wince's breach of collective bargaining agreement and wage claims. R. 58, 84. With respect to the breach of collective bargaining agreement claim, the district court held that the LMRA preempted this claim because it required an interpretation of what the CBAs required for transfers, overtime, promotions, and vacation pay. R. 84 at 8-11. The district court also found Wince did not allege sufficient facts supporting his claim that the union violated its duty of fair representation. R. 84 at 11-16.

### 3.     Summary Judgment

On May 5, 2021, defendants moved for summary judgment on all counts in the third amended complaint. R. 120. On March 10, 2022, the district court granted the motion. R. 143 at 1-43.

In its decision, the district court first analyzed whether Wince provided sufficient evidence to support a verdict by a reasonable jury that Wince was the victim of race discrimination, as required by *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); R. 143 at 24. Because it was unclear whether Wince was applying the framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or a holistic approach, the district court applied both. R. 143 at 25.

Under *McDonnell Douglas,* the district court found Wince could not meet his burden. For his failure to promote claim, Wince did not produce sufficient evidence

that CBRE promoted someone who was not better qualified and that while Saulig once told him he was not liked, Wince could not connect that comment to his race or any promotion decision. R. 143 at 26-27. Overtime in Controls was awarded to individuals who—unlike Wince—worked in that group such that Wince was not similarly situated, and often when this overtime was awarded, it was awarded to Black employees. *Id.* at 28-29. More generally, Wince did not offer evidence that similarly situated non-Black employees received more overtime opportunities. *Id.* at 35. Wince did not ask for holidays off in 2016; was awarded the alternate days he requested in 2017; was denied holidays in 2018 due to insufficient coverage; and was awarded New Year's Day off in 2019. *Id.* at 30-32. Wince had no evidence that defendants' explanations regarding insufficient coverage or lack of seniority were pretextual or that similarly situated non-Black employees received holidays off; to the contrary, defendants provided evidence of more senior Black employees who received holidays off instead of Wince. *Id.* at 31-32. Bonuses were given to all individuals in the same work groups in the same amounts. *Id.* at 33-34. Neither Wince's verbal reprimand nor the assignments—which were within his job duties— about which he complained were tangible job actions, and there was no evidence that similar assignments were not given to similarly situated non-Black stationary engineers. *Id.* at 36-37.

As to Wince's constructive discharge claim, after first recognizing it was not an independent cause of action under Illinois law, the district court found that because none of the allegations amounted to race discrimination, they could not satisfy the standard for a hostile environment claim, let alone the even higher

standard for constructive discharge. R. 143 at 23, 38. Regarding Wince's argument that he had no future at CBRE, the only evidence Wince presented was Pierz's comment that Wince should look outside CBRE for project management roles; this related only to his chance of promotion and not his employment status—which continued thereafter. *Id*. at 38-39.

The district court then addressed Wince's race discrimination claim under the holistic standard. R. 143 at 39-40. Considering all of Wince's evidence in a "single pile", the district court could not find a triable fact, stating that evidence of discrimination "just [was]n't there." *Id*.

Finally, the district court entered summary judgment on Wince's retaliation claim, first noting that Wince only made "fleeting remarks about retaliation throughout." R. 143 at 41, 43. The court found Wince's complaints about racism in promotions came several years before he left CBRE—weakening any inference of retaliation—and there was no evidence connecting his complaints to any adverse action. *Id*. at 42.

Wince appealed. On appeal, Wince challenges the dispositions of: Count IV of the second amended complaint alleging breach of the collective bargaining agreement; Count I of the third amended complaint alleging race discrimination against CBRE under Title VII; Count II of the third amended complaint alleging race discrimination against defendants under Section 1981; and Count IV alleging constructive discharge against CBRE. Br. at 15-31. Wince's brief also implicates Count III of the third amended complaint alleging retaliation against CBRE under Title VII. *Id*. at 3.

14

## SUMMARY OF ARGUMENT

Wince's wide-ranging claims alleging race discrimination fail to adduce evidence showing a genuine issue of material fact. His arguments lack both legal and evidentiary support, and often rely upon waived theories.

Wince contends the district court erred by weighing competing inferences related to his race discrimination allegations. Not so. As evidenced in the district court's robust opinion, a thorough review of the record shows Wince failed to adduce any admissible evidence from which any inference of discrimination on the basis of race could be drawn against defendants. Even Wince's attempt to distort the applicable legal standard in several instances cannot save his claims.

As to his constructive discharge claim, Wince does not challenge the district court's holding that constructive discharge is not an independent cause of action and thus he has waived any argument to the contrary. Also, he misstates the law by suggesting that evidence of a hostile environment is sufficient to establish constructive discharge based on race. Br. at 26. It is settled law that constructive discharge requires a showing of conduct "even more egregious than the high standard for a hostile work environment." *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004). Also, by summarily arguing that a hostile environment is a "question of fact for the jury" (Br. at 25), he misstates governing law that this question can be removed from the jury where—as here—a court determines that no reasonable jury could find the conduct at issue severe or pervasive. *See Johnson v. Advocate Health & Hospitals Corp.*, 892 F.3d 887, 901 (7th Cir. 2018).

15

Wince finally argues the district court erred in finding his breach of contract claim preempted under Section 301 of the LMRA. He attempts to draw a distinction between claims that require a court to "interpret" a collective bargaining agreement's meaning and those that involve a dispute over whether undisputed terms were followed or violated. Br. at 28-29. Yet, no such distinction exists under the law nor does it arise under the facts pled by Wince. Nor does Wince overcome the district court's finding that he failed to plead sufficient detail to support a claim that the union breached its duty of fair representation.

For all these reasons, the Court should affirm summary judgment in defendants' favor.

## ARGUMENT

Wince repeatedly failed to elicit evidence creating a genuinely disputed issue of material fact regarding any of his theories or claims of discrimination. Wince rests his appeal upon legal theories he failed to raise below and misstatements of the legal standard. This Court should affirm.

## I.    STANDARD OF REVIEW

This Court reviews the grant of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) de novo, viewing the complaint in the light most favorable to the plaintiff and accepting all well-pleaded facts as true. *Lax v. Mayorkas*, 20 F.4th 1178, 1181 (7th Cir. 2021). Plaintiffs are entitled to reasonable inferences in their favor, however, neither inaccurate statements of law nor unsupported conclusory factual allegations need be accepted. *Id.*

This Court reviews the grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party, and may affirm for any reason supported by the record. *E.g., Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). "[T]he obligation of the party opposing summary judgment is to demonstrate that there are one or more . . . factual disputes . . . by identifying admissible evidence that would permit the trier of fact to make a finding in the non-movant's favor as to any issue as to which it bears the burden of proof." *Packer v. Trs. of Indiana Univ. Sch. of Med.,* 800 F.3d 843, 847 (7th Cir. 2015). Non-movants are only entitled to reasonable inferences in their favor—not speculative ones. *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016).

Wince misstates the summary judgment standard, citing to *Courtney v. Biosound, Inc.*, 42 F.3d 414, 418 (7th Cir. 1994), as requiring summary judgment cases to be approached "with added rigor", and *Courtney*, 42 F.3d at 424, and *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1313 (7th Cir. 1989), as requiring cases involving discriminatory intent to be approached with "special caution." Br. at 16. Since then, however, this Court clarified that neither a "special summary judgment standard" nor a separate rule of civil procedure applies to summary judgment in employment discrimination cases, despite intent and credibility typically being critical questions. *Simpson v. Beaver Dam Cmty. Hospitals, Inc.,* 780 F.3d 784, 789 (7th Cir. 2015); *Majors v. GE*, 714 F.3d 527, 532 (7th Cir. 2013).

17

**II.    THE DISTRICT COURT PROPERLY ANALYZED WINCE'S RACE DISCRIMINATION CLAIM AND GRANTED SUMMARY JUDGMENT**

**A.    Applicable Legal Standard**

The singular question in a discrimination case is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . or other proscribed factor caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765. Applying *Ortiz*, the district court properly concluded that Wince failed to present evidence that would allow a reasonable juror to find that defendants discriminated against him based on his race. R. 143 at 40-41.

Employing the burden-shifting framework of *McDonnell Douglas* is one way to determine whether discrimination is present. Br. at 19-20. Under that framework, Wince must first make a prima facie showing that (1) he is a member of a protected group, (2) he met defendants' legitimate expectations, (3) he suffered an adverse employment action, and (4) similarly situated persons outside the protected group were treated more favorably. *McDonnell Douglas*, 411 U.S. at 802. In a failure to promote context, Wince must show (1) he was a member of a protected class, (2) he was qualified for the position sought, (3) he was rejected, and (4) someone outside of the protected class was selected who was not better qualified for the positions. *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 892 (7th Cir. 2016). In both cases, the burden then shifts to defendants to show "[a] legitimate, non-discriminatory reason for the [employer's action]", after which Wince must establish pretext. *McDonnell Douglas*, 411 U.S. at 802. Wince cannot—and did not—make this showing.

18

Wince suggests this Court should proceed directly to the question of whether he successfully established pretext in his failure to promote claim "without first analyzing whether [he] has established a prima facie case under the *McDonnell Douglas* framework." Br. at 21. However, the cases that Wince cites for this proposition do not *require*—as Wince suggests—this Court to skip steps in the analysis of a failure to promote claim, nor do they involve failure to promote claims. *Id.* (citing *Oliver v. Joint Logistics Managers, Inc.*, 893 F.3d 408, 412 (7th Cir. 2018) (it was "assume[d]" that the plaintiff had established the elements of his prima facie case); *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 885 (7th Cir. 2012) (stating a court "may" skip over the initial burden-shifting of the indirect method and focus on pretext); *Brownlee v. Kyocera Sgs Precision Tools, Inc.*, Cause No. 1:20-CV-00450-HAB, 2022 U.S. Dist. LEXIS 56615, at *10 (N.D. Ind. Mar. 29, 2022) (the district court proceeded to the question of pretext but did not hold this was required)). Here, Wince does not meet all of the elements of his prima facie case and therefore this Court can end its analysis there without going on to review the question of pretext. *See* R. 136 at ¶¶ 3-10; R. 143 at 24-39. Either way, this Court should affirm the district court's summary judgment decision as Wince has no evidence that any of defendants' legitimate, nondiscriminatory reasons for their actions are pretextual.

## B. Wince Cannot Meet the *McDonnell Douglas* Test On Any of His Claims

The district correctly concluded that Wince is unable to meet the *McDonnell Douglas* test on any of his claims. R. 143 at 39. He is unable to show that promotions went to less qualified people or that he was treated less favorably than

similarly situated employees with respect to assignments or discipline (which also do not constitute adverse employment actions). *Id*. at 26-27, 36. There is no evidence he reported any discriminatory comments to CBRE or that any of CBRE's legitimate, nondiscriminatory reasons for its actions are a pretext for discrimination. *Id*. at 39-40.

In order to show that he had sufficient evidence by which a jury could find that race *caused* (Wince incorrectly uses the word "influence[d]" (Br. at 23) and yet again relies on an incorrect legal standard—*see Ortiz*, 834 F.3d at 765) alleged adverse employment actions, Wince focuses on eight pieces of evidence, as follows:

*Complaints (1-2)*. Wince references (1) discussing promotion concerns in an investigation in 2013-14 and (2) filing two grievances and calling the ethics hotline in 2017-18. Br. at 23. Yet, Wince mostly argued before the district court that these complaints supported his claim of retaliation, not race discrimination. R. 133 at 6, 26. Undeveloped arguments are waived. *E.g., Shipley v. Chicago Bd. of Election Comm'rs*, 947 F.3d 1056, 1063 (7th Cir. 2020). Moreover, raising internal complaints does not evidence discrimination. Wince must instead show this Court evidence of discrimination in relation to these complaints, which he cannot do.

Wince, for example, does not allege similarly situated employees were treated differently in the way their complaints or grievances were resolved. Br. at 23. Nor does he argue that he suffered any adverse actions in connection with his complaints, or that CBRE's responses were a pretext for discrimination. *Id*. Nor can he show his or others' complaints were ignored. Indeed, the evidence shows the opposite. CBRE, for example, brought in an outside attorney to investigate the

concern brought forward by Wince's coworker, thus evidencing its commitment to equal employment opportunities. R. 121-1 at 36(9-24), 37 (1-24), 38(1-5); R. 141 at ¶ 19; *see Hunt v. Wal-Mart Stores, Inc.*, 931 F.3d 624, 630 (7th Cir. 2019) ("This Court has often said, 'a prompt investigation is the hallmark of a reasonable corrective action.'") (citing *Porter v. Erie Foods Intern., Inc.*, 576 F.3d 629, 637 (7th Cir. 2009)).

Concerning his two grievances, Wince did not allege race discrimination in either grievance. R. 137 at ¶ 8; R. 141 at ¶ 49. In resolution of his grievance over holidays, he was given a holiday off in addition to an alternate date, even though he filled the request form out incorrectly. R. 141 at ¶¶ 49, 50, 53. As to his grievance about Controls overtime, this overtime was awarded to several Black employees such that Wince could not in those instances show that similarly situated non-Black employees were treated more favorably. *Id.* at ¶ 62. And, he has no evidence to refute CBRE's legitimate, nondiscriminatory reason for denying him the overtime: he was not officially in Controls, unlike the individuals who were given the overtime. *Id.* at ¶¶ 62, 63. Finally, after the grievance was denied, Wince could not recall whether he pursued it further. *Id.* at ¶ 63.

After Wince's complaint to the ethics hotline in 2017 about his alleged failure to be promoted based on his race, Pierz had a career development conversation with him. R. 141 at ¶¶ 18, 43, 45. During that discussion, he encouraged Wince to take a project management course and approved tuition reimbursement toward the course, including providing Wince with unscheduled PTO to take it. *Id.*; R. 121 at Ex. 41.

*Lunchbox Comments (3).* In 2016/2017, the "n-word", "you don't belong" and "we don't want you here" were written on Wince's lunchbox. R. 141 at ¶ 77. Wince

does not know who wrote the comments and admits he never told CBRE about them. *Id*.; R. 143 at 40. Thus, without knowing who wrote the comments or evidence they were reported to CBRE, they cannot form the basis of a race discrimination claim against defendants. R. 143 at 39-40; *see Paschall v. Tube Processing Corp.*, 28 F.4th 805, 816 (7th Cir. 2022) (employer cannot be liable for coworker's harassment if plaintiff fails to report concerns to supervisors).

*Told He Was Not Liked/Had No Future (4). First*, Wince claims Saulig once in a meeting said to Wince: "we don't like you." Br. at 23; R. 141 at ¶ 70. *Second*, prior to June 2018, Wince testified Pierz told him they did not have any immediate leadership positions for him and he probably would be better off looking outside of CBRE where they had immediate project manager positions open. R. 141 at ¶ 68. Wince does not know if Saulig or Pierz made similar comments to anyone else (*id*. ¶¶ at 68, 70), and thus has no evidence he was treated differently than similarly situated employees or that the comments were made based on his race. And on their face, the comments do not evidence discriminatory intent. *See Brown v. Advocate S. Suburban Hospital & Advocate Health & Hospitals Corp.*, 700 F.3d 1101, 1106 (7th Cir. 2012) (negative, race-neutral comments not evidence of discrimination); *Blasdel. v. Northwestern Univ.*, 687 F.3d 813, 822 (7th Cir. 2012) (remarks that plaintiff was "scary" and "combative" were not evidence of discrimination). Further, Pierz's comment was not evidence of imminent termination. R. 143 at 38-39. Wince maintained his job for more than a year after the discussion took place until he left in October 2019. R. 141 at ¶ 80; *see Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 854 (7th Cir. 2015) ("'[I]solated comments are not probative of discrimination

unless they are 'contemporaneous with the discharge or casually related to the discharge decision-making process.'") (quotation omitted).

*Nickname (5)*. Wince complains he was "consistently" referred to by a nickname "Sly". Br. at 23; R. 141 at ¶ 78. Wince testified that "people just felt abbreviat[ing] my name [Sylvester] was easier to remember me by." R. 121-1 at 12(8-9). At deposition, Wince said he believed being called Sly was racially derogatory because "[w]hen you think of someone as Sly, you think of someone sneaky or like a – you know, like someone that's trying to do something on – you know, not honest." R. 121-1 at 13(8-15). While employed at CBRE, Wince never told anyone he believed the nickname was racially derogatory, but rather told others he was uncomfortable being called a name that "wasn't [his] name." R. 121-1 at 15(13-24), 16(1). When he told them he did not like being called Sly, they stopped. R. 121-1 at 13(1-7), 15(16-17); R. 141 at ¶¶ 78-79; *see Cole v. Bd. of Trs.*, 838 F.3d 888, 897 (7th Cir. 2016) (the record did "not support a reasonable inference" that the alleged hostility was "connected to [plaintiff's] race").

*Repair Equipment (6)*. Wince complains in early 2019, he had to repair kitchen equipment with which he was unfamiliar and ill-equipped. Br. at 23; *see* R. 121-1 at 168(11)-169(4); R. 137 at ¶ 3. Wince admitted he did not know if Hernandez made others conduct similar repairs. R. 141 at ¶ 73. As Wince acknowledges, stationary engineers provide a range of services, including urgent corrective and routine repairs on all sorts of equipment. Br. at 3 (citing R. 141 at ¶ 8). The kitchen repair therefore falls squarely within his job duties and thus is not evidence of race discrimination. *See Hobbs v. City of Chicago*, 573 F.3d 454, 464 (7th

Cir. 2009) ("No reasonable jury could conclude that being assigned duties that were part of one's job description . . . amount[s] to a hostile work environment.").

*Discipline (7)*. Wince received a verbal warning from Hernandez for failing to respond to a work order regarding a water leak in a kitchen. Br. at 10, 23; R. 141 at ¶ 13. The verbal reprimand came with no loss of pay, and Wince offered no other tangible repercussions. R. 143 at 36. *See Robertson v. Wisconsin Dep't of Health Servs.*, 949 F.3d 371, 383 (7th Cir. 2020) ("[u]nfair reprimands or negative performance reviews, unaccompanied by tangible job consequences, do not suffice" as adverse employment actions) (citing *Boss*, 816 F.3d at 919). Therefore, he cannot meet the third element of his prima face case—that he suffered an adverse action. Nor can he refute the reason for the reprimand where he admits that he did not respond to the order. R. 121-1 at 168(11-24), 169(1-4). Wince testified he disagreed with the warning and thought Hernandez wanted to make his work record look bad because he was a "minority." Br. at 10; R. 141 at ¶¶ 13, 73. Speculation, however, is not evidence of pretext, which requires the reason for an action to be "a lie or completely lack[ing] a factual basis." *See Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000). Thus, the district court properly found that no reasonable jury could find race discrimination based on a verbal reprimand, particularly where Wince offered no evidence linking that treatment to his race. R. 143 at 36, 40.

*Brudniak's Promotion (8)*. Wince argues that he should have been promoted to the assistant chief engineer roles that became available in 2015 and 2016 and that Brudniak—the individual selected for the positions—did not have a project manager certification or a college degree, unlike Wince. Br. at 23-24.

Yet Wince ignores critical information and thus cannot meet his burden at the prima facie stage of showing that someone outside of the protected class was selected who was not better qualified for the positions. Initially, Wince's statement is misleading—he did not have a completed project management certification, but rather only finished one class. Br. at 7 (citing R. 141 at ¶ 44); R. 141 at ¶ 43. Further, Wince ignores the significant differences in experience and qualifications between the two candidates.

Significantly, Wince admitted in his deposition that he did not know who selected Brudniak or why. R. 141 at ¶ 38.  Defendants introduced an uncontroverted declaration from Sean Holland stating that he, along with a panel of other employees, selected Brudniak for the role each time because he had the best qualifications, skills and ability to perform the job among the candidates given he (1) was already serving in an assistant chief engineer ("ACE") role and in relation to the second opening, was rebidding for the exact role he previously held and (2) had licenses/certifications as follows: Air Conditioning, Refrigeration & Heating, Boiler Operations I, Universal Refrigerant Transition and Recovery Certification, Refrigeration Light Commercial Certification and a Stationary Engineer's license. *Id*. at ¶ 39.

With respect to the first reason, as the district court found, the job progression from stationary engineer generally is to lead engineer, then to ACE and then to chief engineer. R. 141 at ¶ 33; R. 143 at 26. Brudniak already was serving in an ACE role each time he was selected for a new ACE role, unlike Wince who had never previously served as an ACE, let alone even as lead engineer. R. 141 at ¶ 38;

R. 143 at 27. Thus, the district court appropriately concluded that Brudniak had better qualifications than Wince because he had experience in a higher-level position. R. 143 at 27. Also, in relation to licenses/certifications, Wince—unlike Brudniak—only had "basic qualifications and certifications to perform the work that any general Stationary Engineer could be assigned." R. 141 at ¶ 39; R. 143 at 27.

Nor can Wince meet his burden of showing that hiring Brudniak was pretextual. Brudniak unquestionably had prior experience as an ACE that Wince did not have and licenses and certifications beyond those held by Wince. Pretext means a "phony reason" for some action. *Chatman v. Bd. of Educ. Of Chi.*, 5 F.4th 738, 746 (7th Cir. 2021) (citing *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995)). Wince offers no such evidence.

Because CBRE had legitimate, non-pretextual reasons for its decisions, it is not for this Court to second-guess. *See Boston v. U.S. Steel Corp.*, 816 F.3d 455, 465 (7th Cir. 2016) ("'[I]f an employer acted in good faith and with an honest belief, [this Court] will not second-guess its decisions.'") (quotation omitted); *Gillems v. Hapag-Lloyd Am., Inc.*, 523 Fed. Appx. 415, 417 (7th Cir. 2013) ("[This Court is] not 'a superpersonnel department where disappointed . . . employees can have the merits of an employer's decision replayed to determine best business practices.'") (quotation omitted).

Finally, Wince does not refer to his allegations regarding menial tasks, regular overtime, holiday pay, paid time off, bonuses, the chief engineer promotion, or tuition reimbursement in arguing that he presented sufficient evidence for a jury

to infer race discrimination, although he references facts related to these issues in his statement of facts. *Compare* Br. at 4, 8-9 *with* Br. at 23-24. Thus, he has waived any argument that any of these events contributed to a claim of race discrimination. Undeveloped arguments are waived. *E.g., Shipley*, 947 F.3d at 1063. And arguments not raised in an opening brief cannot be raised in a reply. *E.g., Nikoloff v. Ziliak*, 827 Fed. Appx. 600, 601 (7th Cir. 2020). Regardless, as the district court correctly found, there was no evidence of discrimination on the basis of race with respect to any of these issues, individually or as a whole. R. 143 at 7-19.

### C.    Wince's Evidence As A Whole Is Insufficient

The district court correctly concluded that "even when considering all Wince's evidence at once, the [c]ourt can't see a triable fact." R. 143 at 39. While Wince attributes many work-related issues to discrimination, "after a close look at the record, the evidence simply isn't there." *Id*. The evidence shows that "[Wince] lost out on promotions to more qualified people." *Id*. There was no evidence CBRE treated Wince unfavorably compared to his coworkers when it came to offering opportunities for overtime. *Id*. at 39-40. His boss "scolded him once for not doing his job" and "Wince got upset when his boss asked him to do jobs." *Id*. at 40. As the district court found: "Those workplace frustrations happen from time to time. But Wince offers no evidence linking that treatment to his race." *Id*. Also, there is no evidence the company tolerated the racist comments found on Wince's lunchbox; Wince does not know who put the comments there and "never told anyone about it." *Id*. And, there is no evidence Wince told anyone he believed the nickname he was

called was racist. *Id*. at 19. In sum, Wince "did not provide any evidence of race discrimination." *Id*. at 40.

Wince nevertheless argues that the district court erred in "weigh[ing] competing inferences" where there was "uncontroverted evidence" as set forth above. Br. at 23. In so doing, he relies on language from *Brownlee v. Kyocera SGS Precision Tools, Inc*., stating "in the face of competing inferences, it is not this [c]ourt's job to weigh the evidence." 2022 U.S. Dist. LEXIS 56615, at *13. This argument fails for several reasons.

*First*, the district court did not "weigh" competing inferences but, rather, considered the evidence as a whole and found, "after a close look at the record, [that] the evidence [of discrimination] simply [wa]sn't there." R. 143 at 39. And, considering all of Wince's evidence at once, the district court could not see a triable fact. *Id*. at 39-40. That finding should be upheld.

Wince lost out on promotion to ACE roles to a clearly more qualified individual. *See Chatman*, 5 F.4th at 748 ("When we put the evidence in 'a single pile' and evaluate it 'as a whole' we cannot say that a reasonable jury could find that Ms. Chatman's age or race led to the Board's hiring decisions . . . . Where the Board hired other candidates, it provided clear, legitimate, and documented reasons why it chose other candidates.") (quoting *Ortiz*, 834 F.3d at 766). Nor is there evidence the company treated Wince unfavorably when it came to opportunities for overtime. R. 143 at 40. As the district court found, Wince's boss once scolded him for not doing his job and Wince got upset when his boss asked him to do jobs he didn't like but Wince offered no evidence linking that treatment to his

race. *Id*. Wince does not know who wrote the comments on his lunchbox and there is no evidence that the company tolerated such behavior, particularly where Wince never told anyone about it. *Id*. Similarly, while Wince did not like his nickname "Sly" and believed it was racist, he never shared that belief with anyone at the company. *Id*. at 19. The company investigated complaints and grievances Wince brought forward, ultimately providing him some relief in relation to one of them. *Id*. And, while Pierz once told him to look outside CBRE for project management roles, that had nothing to do with any termination of Wince's employment at CBRE; if anything, it was relevant only to the question of Wince's desire for an immediate promotion. *Id*. at 38-39.

*Second*, there were no "competing" inferences of race discrimination to be drawn from the evidence. As shown above, and as the district court correctly found, none of the evidence Wince marshals—either individually or collectively—lead to any inferences of race discrimination. R. 143 at 24-40.

Thus, as the district court properly found, viewing all of Wince's evidence "[in a] pile", there simply is no triable fact here. R. 143 at 39.

### D.    Wince's Cases Are Inapposite

Wince cites to three cases in support of his argument to get to a jury. He argues these cases support the conclusion that one or two "suspicious" facts are sufficient. Br. at 22-23. His argument is based on a lower standard that is neither depicted in the cases he cites nor consistent with the true standard before the Court—that the evidence be considered as a "whole."

*First*, he claims that *Coleman v. Donahoe*, 667 F.3d 835, 861 (7th Cir. 2012), and *Hitchcock v. Angel. Corps., Inc.*, 718 F.3d 733 (7th Cir. 2013), establish that "seemingly minor pieces of evidence" are sufficient to deny summary judgment. Br. at 22-23. That is not what *Coleman* held. In *Coleman*, after complaining of discrimination, the plaintiff—suffering from asthma and undergoing surgery—was ordered to clean a dirty storeroom and move heavy boxes, disciplined on several occasions, suspended and then terminated weeks after filing an EEOC charge. 667 F.3d at 842-44, 861. The court found that this sequence of protected activity *and* punitive action could lend some support to a reasonable juror's inference of retaliation. *Id.* at 861. Likewise, in *Hitchcock*, 718 F.3d at 738, 740, the plaintiff proffered evidence both that the employer's reasons for its actions were pretextual *and* that the explanations were a pretext for pregnancy discrimination. In addition to the shifting explanations for her termination, Hitchcock's supervisor asked her if she was "quitting" after she told her she was pregnant, recommended a co-worker get an abortion because her pregnancy would lead to "attendance" problems, and assigned Hitchcock significant tasks that others previously handled. *Id.* at 738, 740-42. These cases are not at all analogous here.

Wince then erroneously argues that under *Brownlee,* "one suspicious fact" can be enough to create a genuine issue of fact for the jury to decide. Br. at 22. *Brownlee*, however, does not set that standard, nor is it factually analogous. In that case, the hiring manager changed his reasons for not selecting Brownlee on multiple occasions after reviewing Brownlee's Facebook page, which identified his race. *Brownlee*, 2022 U.S. Dist. LEXIS 56615 at **5, 11-14. Based on the company's

inconsistent and shifting explanations and the fact that the hiring manager

changed his mind about not interviewing Brownlee only *after* reviewing the

Facebook page, among other reasons, the court concluded that a jury could

reasonably conclude that the company refused to hire Brownlee based on his race.

*Id.* at *11-15. Unlike in *Brownlee*, there are no suspicious circumstances here or

changing explanations for the decisions made with respect to Wince's employment.

In sum, none of the cases cited by Wince are factually analogous and,

therefore, they lend no support to his claims.

## III.    THE DISTRICT COURT PROPERLY GRANTED DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON WINCE'S CONSTRUCTIVE DISCHARGE CLAIM

The district court properly found that Wince's constructive discharge claim is

not an independent cause of action. R. 143 at 23. And, even analyzing that claim in

the context of his race discrimination claim, the evidence is not there. *Id*. at 37-39.

Wince cannot show that he suffered from working in a hostile work environment, let

alone meet the higher standard of showing the "even more egregious" conduct that

is required to establish a constructive discharge. *Id*. at 37. Nor could Wince show an

impending termination where he offered no evidence that CBRE planned to fire

him. *Id*. at 38-39. While he claimed that Pierz once told him to look elsewhere for a

*promotion*, that statement had no bearing on *termination*, especially where Pierz

gave him guidance on how to improve his qualifications and Wince remained

employed over a year after that conversation. *Id*.

Wince does not challenge the district court's finding that Illinois does not

recognize an independent cause of action for constructive discharge. *Seddon v.*

*Maytag Corp.*, 178 Fed. Appx. 557, 559 (7th Cir. 2006); *Washburn v. IBP, Inc.*, 910 F.2d 372, 374 n.1 (7th Cir. 1990). He has therefore waived any such argument here. "'[A] party cannot complain of errors which it has committed, invited, induced the court to make, or to which it consented.'" *Black v. Wrigley*, 997 F.3d 702, 709 (7th Cir. 2021) (quoting *Int'l Travelers Cheque Co. v. BankAmerica Corp.*, 660 F.2d 215, 224 (7th Cir. 1981)). For this reason alone, summary judgment on this claim should be granted. *See* R. 96 at Count IV.

Rather, Wince argues that when constructive discharge is related to the question of what constitutes a hostile work environment, the district court "should not have been so quick to dismiss" his claim. Br. at 26. Yet, his argument rests on an erroneous statement of the law: whether an individual has been constructively discharged requires a showing of conduct "'even more egregious than the high standard for a hostile work environment.'" *Fields v. Bd. of Educ.*, 928 F.3d 622, 625 (7th Cir. 2019) (constructive discharge occurs when plaintiff resigns due to "discriminatory 'working conditions even more egregious than that required for a hostile work environment claim.'") (quotation omitted); *Herron*, 388 F.3d at 303 (same).

Also, as shown in a case cited by Wince, courts have held that the question as to whether harassment was so severe or pervasive as to constitute a hostile work environment can be removed from the jury where a court determines that no reasonable juror could find the conduct at issue severe or pervasive. *Johnson*, 892 F.3d at 901. Wince's only analysis is to quote *Johnson*'s finding that—in that matter—"it is certainly possible that a reasonable jury could find that the conduct

32

was pervasive or severe based on the claims of racially derogatory speech used by [the employee] supervisors." Br. at 25-26 (citing *Johnson*, 892 F.3d at 901).

The facts in *Johnson* are not analogous. It was found in that case that the *Johnson* plaintiffs put forth evidence that one supervisor routinely harassed them by trying to mock the speech of the African American employees, directly calling them "ni**er", and of other supervisors calling them "[B]lack wig-wearing witches", "a [B]lack B. Bioplar. Crazy", and telling a plaintiff she had a "[B]lack girl ghetto attitude." *Johnson*, 892 F.3d at 903. Here, Wince testified that *he never heard any inappropriate racial remarks while employed at CBRE*. R. 121 at 285(5-8); R. 141 at ¶ 77. At most, he argues that inappropriate comments showed up on his lunchbox and that he did not like his nickname (Br. at 23), but he never told anyone about the lunchbox comments or shared his belief that the nickname was racist. R. 141 at ¶¶ 77, 79. There was simply no evidence that CBRE tolerated any racist behavior. R. 121-1 at 12(8-9); R. 143 at 19, 40.

The remaining cases cited by Wince are similarly inapposite and, again, involve far more egregious conduct than that alleged by Wince. Br. at 25; *see Passananti v. Cook Cnty.*, 689 F.3d 655, 669 (7th Cir. 2012) (supervisor called plaintiff a "bitch", "lying bitch", and "fucking bitch" "nearly constantly" for several years in front of others and accused her of having sex with an inmate); *Smith v. Rock-Tenn Servs.*, 813 F.3d 298, 310 (6th Cir. 2016) (multiple instances of "physical invasion" including "a slap on the rear", "a painful grab on the rear", and a "grab by the hips" that simulated sexual intercourse); *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 335 (sexist comments were frequently made to plaintiff, co-workers

often described sexual encounters, and plaintiff was consistently the subject of selective taunting); *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 799 (10th Cir. 2007) (dealership owner repeatedly subjected plaintiff to comments about a woman's "appropriate" role in the workplace, co-workers used "sexual epithets" to describe her, and plaintiff intercepted an email describing her genitalia).

As set forth above, Wince's cases are entirely factually distinct from this action and Wince has not adduced admissible evidence of a hostile work environment, let alone a constructive discharge.

## IV.   THE DISTRICT COURT PROPERLY GRANTED CBRE'S MOTION FOR SUMMARY JUDGMENT ON WINCE'S RETALIATION CLAIM

Wince has waived any appeal of his retaliation claim because he does not sufficiently challenge the district court's decision on that claim. Br. at 16-31; *see* R. 96 at Count III; *Black*, 997 F.3d at 709 ("'[A] party cannot complain of errors which it has committed, invited, induced the court to make, or to which it consented.'") (quotation omitted). At best, Wince makes passing references to having (1) discussed his concerns about the past treatment of African Americans during a 2013-2014 investigation and (2) filed two grievances and called the ethics hotline in 2017-2018. Br. at 23. At bottom, Wince's treatment of his retaliation claim on appeal is even weaker than his "fleeting remarks about retaliation" presented below. R. 143 at 41.

As the district court found, there is no evidence that the company treated Wince adversely in any way because he complained about discrimination. *Id*. His complaints about racism in promotions and to outside counsel came years before he

left CBRE in 2019. *Id.* at 42 (citing *Malin v. Hospira, Inc.*, 762 F.3d 552, 560 (7th Cir. 2014)). Nor is there any circumstantial evidence to support a claim of retaliation where Wince does not connect any of his complaints to any adverse action. R. 143 at 42. Wince's undeveloped arguments are waived. *E.g., Shipley*, 947 F.3d at 1063.

## V.    THE DISTRICT COURT PROPERLY GRANTED DEFENDANTS' MOTION TO DISMISS WINCE'S BREACH OF CBA CLAIM

The district court properly found that Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), preempts Wince's breach of collective bargaining agreement claim because it depends upon the meaning of and requires interpretation of the collective bargaining agreements' provisions regarding transfers, promotions, overtime and time off. R. 84 at 10-11. It also correctly concluded that Wince failed in his attempt to keep his claim in federal court because his allegations of a breach of the union's duty of fair representation were insufficiently pled. *Id.* at 16.

### A.    Section 301 of the LMRA preempts Wince's Breach of Contract Claim

Section 301 of the LMRA completely preempts state law claims—such as Wince's—that hinge on the interpretation of collective bargaining agreements. *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 394 (1987); *see also Nelson v. Stewart*, 422 F.3d 463, 467 (7th Cir. 2005) ("The Supreme Court has applied the complete preemption doctrine in cases that raise claims preempted by section 301 of the LMRA."). "If the resolution of a state law claim depends on the meaning of, or requires the interpretation of, a collective bargaining agreement, the application of

35

state law is preempted and federal labor law principles must be employed to resolve the dispute." *Atchley v. Heritage Cable Vision Assocs.*, 101 F.3d 495, 499 (7th Cir. 1996) (citing *Lingle*, 486 U.S. at 405–06, 407, 409–10, 413). A state law claim hinges on such interpretation when it is "founded directly on rights created by collective-bargaining agreements, and also claims 'substantially dependent on analysis of a [collective-bargaining] agreement.'" *Caterpillar*, 482 U.S. at 394 (quoting *Electrical Workers v. Hechler*, 481 U.S. 851, 859 n.3 (1987)); *Tifft v. Commonwealth Edison Co.*, 366 F.3d 513, 516 (7th Cir. 2004); *Atchley*, 101 F.3d at 498.

Wince's arguments that his claims do not—and need not—require interpretation of the CBAs are factually and legally unsupported. Br. at 28-29. Irreconcilably, Wince alleges that CBRE violated the collective bargaining agreements' provisions regarding transfers, promotions, overtime, and time off (R. 52 at ¶¶ 118–24), while simultaneously arguing there is no need to interpret any of these terms. Br. at 28-29. As the district court found, this is "[n]ot so." R. 84 at 10. The CBA violation allegations necessarily rest entirely on an understanding of what the CBAs require (R. 52 at ¶¶ 23, 49, 118–24), as follows:

*Overtime.* This claim rests on Wince's interpretation that Controls is not an official group in the CBAs and overtime should have been granted based on seniority; this claim squarely rests on interpretations of the definitions of seniority and work groups in Sections 11 and 12 of the CBAs. R. 52 at ¶ 23; R. 84 at ¶ 10; R. 133 at 14; R. 137 at ¶ 10.

*Holiday Time Off.* Wince argues the CBAs required CBRE to provide holidays off based on "seniority." R. 52 at ¶ 49; R. 84 at ¶ 10. And he rests his claim on his

belief that CBRE provided holiday time off to employees with "less seniority." R. 52 at ¶ 50; R. 133 at 14, 16.

*Paid Time Off.* Wince's paid time off claim almost entirely rests on his belief that CBRE miscalculated his paid time off—the calculation of which is determined by the collective bargaining agreements, and, as Wince alleges, "seniority." R. 52 at ¶ 144; R. 84 at 10; R. 137 at ¶ 7.

*Promotion.* Wince's promotion claim, which rests on his allegation that CBRE, in awarding promotions, "overlooked [Wince's seniority]" in violation of the CBAs and belief that he had more experience than the selected individuals, requires an understanding of the CBAs' requirements for promotions. R. 52 at ¶124; R. 84 at ¶ 10; R. 133 at 11-14; R. 141 at ¶ 31 ("'Vacancies for . . . [Chief Engineer, ACE] . . . will be filled based on qualifications, skills and ability to perform the job, as determined by the employer.'").

Based on the foregoing, resolution of Wince's breach of collective bargaining agreement claims requires interpretation of the terms of the CBAs themselves. *See Atchley*, 101 F.3d at 499 (state law claim preempted if resolution of such claim requires court to depend upon meaning of a collective bargaining agreement).

Wince's reliance on *Pelech v. Klaff-Joss, LP*, 828 F. Supp. 525 (N.D. Ill. 1993), *Lingle v. Norge Division of Magic Chef*, 486 U.S. 399 (1988), and *Pantoja v. Texas Gas & Transmission Corp.*, 890 F.2d 955 (7th Cir. 1989), is misplaced as these cases involve retaliatory discharge claims. As the Supreme Court explained in *Lingle*, the elements of a retaliatory discharge claim under Illinois law—(1) employee was discharged or threatened with discharge; and (2) the employer's motive in

discharging or threatening to discharge the employee—and related defenses are "purely factual" questions that do not require a court to interpret the terms of a collective bargaining agreement. *Lingle*, 486 U.S. at 407. In contrast, Wince's breach of contract claim unquestionably requires interpretation of the underlying CBAs. Br. at 27-29; *see Land of Lincoln Goodwill Indus., v. PNC Fin. Servs. Grp.,* 762 F.3d 673, 679 (7th Cir. 2014) (when evaluating a contract claim under Illinois law, courts "look to the contract as a whole in interpreting its individual terms ….").

## B.     Wince failed to allege sufficient facts to support his claim that the Union violated its duty of fair representation

A preempted claim must be brought under the LMRA, which requires employees to exhaust grievance and arbitration procedures pursuant to collective bargaining agreements before filing suit in federal court. *Olson v. Bemis Co.*, 800 F.3d 296, 299 (7th Cir. 2015) ("'[A]s a practi-cal matter, an employee often cannot go straight to federal court with a [§ 301 of the LMRA] claim because many CBAs . . . have manda-tory provisions that require the employee, represented by his union, to pursue his grievances through arbitration.'") (quotation omitted). An employee can only bring a claim in federal court by alleging the union's representation during the grievance and arbitration process was "'arbitrary or based on discriminatory or bad faith motives.'" *See Yeftich v. Navistar, Inc.*, 722 F.3d 911, 914, 916 (7th Cir. 2013) (citing *Vaca v. Sipes*, 386 U.S. 171, 186–87 (1967) (quotation omitted)). Wince failed to allege sufficient facts to satisfy this requirement, and the district court thus properly dismissed his breach of collective bargaining agreement claim.

38

Wince alleges that he filed seven specific grievances related to holiday time off and, at least, generally, four more grievances related to overtime, promotions, and paid time off. R. 52 at ¶ 126. The remainder of Wince's allegations are conclusory and merely recite the elements of his claim. For instance, Wince proceeds to allege that the union's conduct in processing his grievances "was arbitrary, discriminatory and in bad faith, to the point that the Union breached its duty of . . . fair representation." *Id.* at ¶ 128. Further, Wince generally alleges he hired counsel and filed this lawsuit after he "exhausted the contractual grievance/arbitration procedures" and was "denied the opportunity to have his grievance" addressed. *Id.* at ¶¶ 122, 127. As the district court highlighted, Wince fails to allege non-conclusory facts regarding why he thought the union failed to "timely [address]" his grievances or how long he waited prior to hiring legal counsel and filing this action. *Id.* at ¶ 122; R. 84 at 15-16; *see Yeftich*, 722 F.3d at 917. Without more than Wince's only four-paragraph "skeletal" and threadbare allegations regarding the union's representation, which largely mirror the elements of a claim for breach of the duty of fair representation, his claim is insufficient. *Yeftich*, 722 F.3d at 916 (complaint must include "subsidiary facts," rather than only conclusory "state-of-mind" allegations). Further, Wince's fact-free allegation of the union's arbitrariness in processing his grievances is insufficient to support his claim. *Id.* at 917 (it is insufficient to merely allege a union's "arbitrary failure to act" upon grievances).

Moreover, Wince's reliance on many cases he cites is misplaced and unsupportive of his argument. Br. at 30-31. In each cited case, the courts concluded

that the plaintiffs failed to sufficiently allege or establish a breach of a union's duty of fair representation and, in many of the cases, the courts based their determination on the plaintiffs' similarly conclusive allegations. *Taha v. Int'l Bhd. of Teamsters, Local 781*, 947 F.3d 464, 471-73 (7th Cir. 2020); *Yeftich*, 722 F.3d at 916-17; *Souter v. Int'l Union, United Auto., etc., Local 72*, 993 F.2d 595, 598-99 (7th Cir. 1993); *Cunningham v. United Airlines, Inc.*, No. 13 C 5522, 2014 U.S. Dist. LEXIS 13414, at **35-36, 38 (N.D. Ill. Feb. 4, 2014); *Rogers v. Jewel Food Stores, Inc.*, No. 13 C 6761, 2014 U.S. Dist. LEXIS 138709, at **13-14 (N.D. Ill. Sept. 30, 2014). As such, these cases do not support Wince's argument, and, in fact, indicate that the district court properly dismissed Wince's breach of contract claim.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

                                        Respectfully submitted,
                                        CBRE et al.

By:    /s/ Jill S. Vorobiev
          Jill S. Vorobiev
          Reed Smith
          10 South Wacker Drive, Suite 4000
          Chicago, IL 60606
          jvorobiev@reedsmith.com

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)(B)(i) and CIRCUIT RULE 32(c)**

I hereby certify that this brief complies with the type-volume limit of Federal Rules of Appellate Procedure 28(a)(10) and 32(g)(1), along with Circuit Rule 32(c), because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 11,066 words as counted by the word-processing software used to create the brief. I further certify that this document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), along with Circuit Rule 32(b), because it has been prepared using Word 2016 in New Century Schoolbook 12-point font.

By:    /s/ Jill S. Vorobiev
Jill S. Vorobiev

## CERTIFICATE OF SERVICE

The foregoing Brief of Defendants-Appellees has been electronically filed on

August 10, 2022. I certify that I have caused the Brief of Defendants-Appellees to be

served on counsel for plaintiff-appellant via the CM/ECF system on August 10,

2022.


By:     /s/ Jill S. Vorobiev
        Jill S. Vorobiev